Sathena A. WEST, et al., Plaintiffs,

v.

Margaret L. DUNCAN, Mayor, City of Aurora, Ohio, et al., Defendants.

No. 5:01–CV–1168.

United States District Court, N.D. Ohio, Eastern Division.

Dec. 14, 2001.

Robert O. Garnett, Shaker Heights, OH, for Plaintiffs.

David M. Benjamin, Law Office of David M. Benjamin, Aurora, Frederick P. Vergon, Jr., Smith, Marshall, Weaver & Vergon, Cleveland, OH, for Defendants.

## OPINION

GWIN, District Judge.

On October 23, 2001, Defendants City of Aurora Mayor Margaret L. Duncan, Police Chief Gerald Dietrich, Sergeant Scott Garan, Patrolman Robert Hagquist, and Patrolman Michael Wadlington moved for summary judgment [Docs. 60–61]. Plaintiffs Sathena West, Ciera West, and Tyerell West oppose the motions. Because the Court holds that the plaintiffs have failed to show a constitutional violation and that the defendants are entitled to qualified immunity, the Court grants the defendants' motions for summary judgment.

## I. Background

In this case, the plaintiffs claim that several City of Aurora police officers violated their civil rights during a traffic stop. The plaintiffs say Garan had no probable cause to stop their car. Further, the plaintiffs say the police had no justification to search their vehicle, to search Sathena West, or to prevent Sathena West from comforting her children during the traffic stop. The plaintiffs also say the City of Aurora has an unwritten policy to harass and dissuade African–Americans from coming within its boundaries.

The defendants deny they violated any of the plaintiffs' constitutional rights during the traffic stop. The defendants also say they are immune from liability in the circumstances of this case.

The traffic stop at issue took place shortly after 4:15 p.m. on February 3, 2001. The stop occurred some time after the plaintiffs left the Aurora Farms Premium Outlets shopping district.

At the time of the stop, the plaintiffs occupied a vehicle owned by Sathena West. Five people occupied the vehicle. A boyfriend, Pierre Jackson, operated the car. In addition to Sathena West and Pierre Jackson, Sathena West's sister was in the car. Two young children of Sathena West also occupied the car.

Because Sathena West failed to appear for a noticed deposition, her evidence is found only in the affidavit she attaches to her memorandum opposing summary judgment.

Shortly before being stopped, the car driven by Pierre Jackson left the Aurora Farms Premium Outlets shopping district

with some purchases. As they left the store, Sathena West says a police car watched them load their vehicle. Sathena West says this police car then followed them as Jackson drove their vehicle out of the parking lot. The police car pulled the plaintiffs over shortly after leaving the parking lot.

Sergeant Garan initially stopped the plaintiffs' car. Sathena West claims Garan did not immediately respond to her question about the reason for the stop. Instead, Sathena West says Garan went to the front of the vehicle. According to Sathena West, Garan told her he stopped the car because it did not have a front license plate only after viewing the front of the car. In fact, the plaintiffs' car had front license plate. However, Sathena West says Garan was behind their vehicle and was never able to observe the front of the car until he made the traffic stop.

Because Jackson had an outstanding felony arrest warrant and Sathena West's driver's license was suspended, the police towed the plaintiffs' vehicle. Before towing the vehicle, the officers conducted a search.

As to the search, Sathena West says the police officer asked them to exit the vehicle. She says three police cruisers were present. Once they exited, a police officer began searching the front compartment of the vehicle. Sathena West says a female police officer told her the search was for drugs, stolen property, or weapons. Sathena West also says a male and female police officer searched her. The female officer then searched her purse. In the course of searching the vehicle's trunk, the police found new clothes on hangers. Sathena West says she produced the receipt for the clothes when the police requested it. Sathena West's new clothes were placed in a police cruiser. The police transported Sathena West to the police station in one cruiser and her sister and sons in another cruiser. Once at the station, the police car with Sathena West's clothes drove off on another call. Sathena West says she was rebuffed when she asked about her clothes. After twenty-five minutes, the police cruiser with her clothes returned. Sathena West says the officer brought the clothes into the police station and threw them on the floor.

During the search of the car, Ciera West and Sathena West's sons were placed in the rear of a police cruiser. Sathena West says the police prevented her from comforting her sons when they became distressed.

The defendants' version of events differs. On the date in question, Sergeant Garan says he pulled into the parking lot of the Aurora Farms shopping area when he noticed a 1990 Toyota without a front license plate leaving the lot. He turned around in the parking lot and followed the car, pulling it over shortly thereafter. Before Garan stopped the vehicle, a LEADS computer search showed the vehicle owner's driver's license was suspended. Sathena West was listed as the owner of the car.

Jackson was driving the plaintiffs' car. Garan approached the car and asked Jackson for his driver's license. Jackson did not provide a driver's license but gave Garan his name and social security number. Garan discovered through the LEADS computer that Jackson had an outstanding felony warrant for his arrest. Garan decided to tow the car because Sathena West had a suspended license and no other licensed driver was available to move the car.

Garan says he then searched the car pursuant to the City of Aurora police department's policy of conducting inventory searches before towing vehicles. During

the search, he found new clothing on hangers in the trunk of the car. After asking Sathena West if the clothes were stolen, Garan contacted the Oshkosh store and confirmed Sathena West purchased the clothes.

After Garan decided to tow the vehicle, he asked Sathena West if she wanted a ride to the police station. Garan says she accepted the ride and consented to a search of her purse so she would be permitted in the police cruiser. The dispatcher directed Patrolman Hagquist to the scene to take Sathena West to the police station.

Before Garan stopped the plaintiffs' vehicle, Patrolmen Wadlington says he was in the Aurora Farm Premium Outlets parking lot investigating two African–American suspects for writing bad checks. He observed an African–American man and woman in a vehicle, who he later learned were Sathena West and Pierre Jackson, but determined they were not his suspects. Wadlington says he ran the license plate of the vehicle because the car did not have a front license plate. Wadlington did not follow the plaintiffs' car when it left the shopping district. However, he received a call to back up Garan at a traffic stop. When Wadlington arrived, he found Garan talking to Jackson.

As Garan began searching the plaintiffs' vehicle, Wadlington placed Sathena West's sons and Ciera West in the back of his car where it was "warm and safe." He says the children were in his car for no more than ten minutes before he transported them to the police station.

■ On May 14, 2001, the plaintiffs filed their lawsuit against Garan, Wadlington, Hagquist, Duncan, and Dietrich. They sue under 42 U.S.C. § 1983, alleging various underlying constitutional violations. Specifically, the plaintiffs allege that Garan, Wadlington, and Hagquist stopped their car without probable cause, conducted an unreasonable search of the vehicle and persons, and detained them without cause in violation of the Fourth and Fourteenth Amendments of the United States Constitution. The plaintiffs also allege the traffic stop interfered with their freedom to travel freely throughout Ohio in violation of the Fourteenth Amendment. Finally, Sathena West says the City of Aurora has an unofficial policy of harassing African–Americans in its jurisdiction and that Garan subjected her to the traffic stop because of her race, in violation of her equal protection rights under the Fourteenth Amendment.[1]

Beyond their federal claims, the plaintiffs assert several claims under Ohio law. These claims include false arrest, false imprisonment, intentional infliction of emotional distress, negligent infliction of emotional distress, and a "constitutional tort."

The defendants now seek summary judgment on all the plaintiffs' claims. They challenge whether the plaintiffs have offered sufficient evidence to support their constitutional claims. They also claim immunity under federal and state law.

The Court considers the defendants' motions below.

---

1. The plaintiffs' also bring their Fourth and Fourteenth Amendment claims under 42 U.S.C. § 1981(c) and § 1985(c). However, neither statute applies to such claims. Section 1981 addresses discrimination in contractual relationships, most typically those involving employment. *Morris v. Office Max. Inc.*, 89 F.3d 411, 413 (7th Cir.1996). Sec-

tion 1985 deals with conspiracies directed toward the deprivation of civil rights. Because the plaintiffs' selective enforcement claim involves neither contractual discrimination nor a conspiracy, the Court analyzes the plaintiffs' claims solely under the Equal Protection Clause.

## II. Legal Standard

Summary judgment is appropriate where the evidence submitted shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-moving party's case. *Waters v. City of Morristown, Tenn.*, 242 F.3d 353, 358 (6th Cir.2001). A fact is material if its resolution will affect the outcome of the lawsuit. *Daughenbaugh v. City of Tiffin, Ohio*, 150 F.3d 594, 597 (6th Cir.1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

Once the moving party satisfies its burden, the burden shifts to the non-moving party to set forth specific facts showing a triable issue. *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). It is not sufficient for the non-moving party merely to show that there is some existence of doubt as to the material facts. *Id.*

In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the non-moving party. *National Enters., Inc. v. Smith*, 114 F.3d 561, 563 (6th Cir.1997). Ultimately the Court must decide "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Terry Barr Sales Agency, Inc. v. All–Lock Co.*, 96 F.3d 174, 178 (6th Cir.1996) (internal quotations omitted).

## III. Analysis

### A.

The plaintiffs sue Officers Garan, Wadlington, and Hagquist under § 1983. This statute provides recovery for constitutional deprivations suffered under the color of state law. 42 U.S.C. § 1983 (2001) (stating that every person who, under color of state law, causes "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured...."); *Foy v. City of Berea*, 58 F.3d 227, 229 (6th Cir.1995) ("In order to prevail in a section 1983 action, the plaintiff must prove that some conduct by a person acting under color of state law deprived the plaintiff (or her decedent) of a right secured by the Constitution or other federal laws.").

Garan, Wadlington, and Hagquist seek summary judgment on the plaintiffs' § 1983 claims. They contend the plaintiffs have not offered sufficient evidence of their alleged constitutional deprivations. They also raise the doctrine of qualified immunity as a defense to liability.

■ The doctrine of qualified immunity shields state actors from liability based on their discretionary acts. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (holding that "government officials performing discretionary functions generally are shielded from liability for civil damages"). In so doing, the doctrine gives state actors the freedom to perform their official duties without fear that even a slight misstep will trigger their financial ruin. *Wyatt v. Cole*, 504 U.S. 158, 167, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992) ("Accordingly, we have recognized qualified immunity for government officials where it was necessary to preserve their ability to serve the public good or to ensure that talented candidates were not deterred by the threat of damages suits from entering public service.").

■ State actors lose this immunity when they violate clearly established constitutional rights of which a reasonable person should have known. *Harlow*, 457

U.S. at 818, 102 S.Ct. 2727 (holding that qualified immunity shields state actors only "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."). The doctrine thus offers no solace to "the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

Accordingly, in analyzing the plaintiffs' § 1983 claims, the Court looks first to whether they offer sufficient evidence of a constitutional violation. If so, the Court decides whether the violation involved a clearly established constitutional right of which a reasonable person would have known.

1.

■ First, the plaintiffs first challenge the constitutionality of the traffic stop. They say Garan stopped their vehicle without probable cause.

■ The Fourth Amendment authorizes only reasonable seizures. U.S. Const. amend. IV ("The right of the people to be secure in their persons ... against unreasonable ... seizures ... shall not be violated."). In the context of a traffic stop, the constitutional reasonableness of a stop does not depend upon the police officer's motivation for the stop. *Whren v. United States*, 517 U.S. 806, 812–13, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *United States v. Hill*, 195 F.3d 258, 264 (6th Cir.1999).[2] Irrespective of the motives for the stop, a traffic stop is valid as long as the police office had probable cause for the stop. *See Whren*, 517 U.S. at 812–13, 116 S.Ct. 1769; *Hill*, 195 F.3d at 264.

■ Taking all of the facts in favor of the plaintiffs, they have not established a genuine issue of material fact whether Garan lacked probable cause to stop their vehicle. Ohio law prohibits the operation of a motor vehicle without front and rear license plates in plaint view. Ohio Rev. Code § 4503.21 (2001). Garan says he saw the plaintiffs' car without a front license plate. Observing the car without a front license plate constitutes probable cause for a traffic stop. *See United States v. Harris*, 103 F.Supp.2d 1025, 1028 (N.D.Ohio 2000).

Sathena and Ciera West's affidavits do not contradict Garan and Wadlington's description of events.[3] Nonetheless, the plaintiffs' affidavits raise some inference that Garan had not seen the missing front plate until after the stop.[4] A reasonable

---

**2.** The Court notes that although the Supreme Court has held that an officer's subjective motivations play no role in ordinary probable cause Fourth Amendment analysis, the Court has held that an officer's actual motivation is considered when a claim is brought under the Equal Protection Clause for selective enforcement of the law based on considerations such as race. *See Hill*, 195 F.3d at 265 n. 1 (citing *Whren*, 517 U.S. at 813, 116 S.Ct. 1769).

**3.** Ciera West says:

At the point we left the parking lot, no police car was entering the parking lot. But, a police car was following us, from the time we left Oshkosh. Our car was pulled over soon after we drove into the street, [sic] by the police car that was following us.

Ciera West affidavit at ¶ 2. Similarly, Sathena West says:

I observed a police vehicle looking our way, as we placed our purchases in the trunk of my car.

As we began to drive towards the Exit/Entrance of the parking lot, the same police car seen watching use leave the Oshkosh Store, began following us. At no time was the following vehicle in a position to see a missing front tag.

The following vehicle was never out of my line of vision, and this is the police vehicle that eventually pulled my car over.

Sathena West affidavit at ¶¶ 2–4.

**4.** The plaintiffs' do not challenge Wadlington's statement that he observed the plaintiffs in a vehicle without a front license plate in

jury might find Garan lacked probable cause to make a traffic stop based solely on the front license plate.

However, Garan had other grounds for the traffic stop. While following the plaintiffs' vehicle, Garan learned through a LEADS computer search that the vehicle's owner had a suspended driver's license. Ohio law prohibits driving on a public roadway without a properly issued license. Ohio Rev.Code § 4501.02(A) (2001). Knowing the vehicle's owner had a suspended license gave Garan independent probable cause for a traffic stop. *See, e.g., State v. Powell,* No. CA–1021, 1993 WL 49024, at *1 (Ohio Ct.App. Feb.24, 1993). The plaintiffs offer no evidence disputing Garan's determination that Sathena West's driver's license was suspended.

■ Accordingly, the Court grants the defendant police officers' motion for summary judgment on the plaintiffs' unlawful traffic stop claim under § 1983.[5]

### 2.

■ Second, the plaintiffs say the police conducted an unreasonable search of their vehicle. They say the police lacked probable cause to conduct a search.

■ The Fourth Amendment bars unreasonable searches. U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches ... shall not be violated."). A search absent a warrant is per se unreasonable, "subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

■ One such exception is an inventory search conducted as a standard police practice. *South Dakota v. Opperman,* 428 U.S. 364, 376, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *see also United States v. Hurst,* 228 F.3d 751, 758 (6th Cir.2000). Under this exception, police may search a vehicle properly impounded or towed in order to establish the contents of the car. *Opperman,* 428 U.S. at 370–71, 96 S.Ct. 3092. The entire contents of the car are subject to search to protect the vehicle's owner from loss of his property, to ensure police officer safety, and to protect the police against unfounded accusations of theft. *Id.*

Here, Garan says he searched the plaintiffs' vehicle under the City of Aurora Police Department's vehicle inventory policy. He says he searched the car only after he decided the car would be towed. The department policy directs inventory searches

Aurora Farms Premium Outlet parking lot. It appears the plaintiffs observed Wadlington's cruiser when they left the Oshkosh store. However, all parties agree that Wadlington did not follow and stop the plaintiffs. Garan made the initial traffic stop.

5. The Court also grants summary judgment on the plaintiffs claim that their Fourteenth Amendment right to travel freely was violated by the traffic stop. The Fourteenth Amendment guarantees the right to travel freely to and from a state and on the instrumentalities of interstate transportation within a state. *Saenz v. Roe,* 526 U.S. 489, 500–01, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999) (citing *United States v. Guest,* 383 U.S. 745, 747, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966)).

The plaintiffs allege that Garan's stop of their vehicle violated their right to travel freely within the state of Ohio. However, the plaintiffs do not develop this argument in their opposition to summary judgment. In addition, as described above, Garan had probable cause to stop the plaintiffs' vehicle. A police officer's enforcement of a valid traffic law is not a violation of the plaintiffs' right to travel. *See, e.g., U.S. ex rel Verdone v. Circuit Court for Taylor County,* 851 F.Supp. 345, 350 (W.D.Wis.1993) (citing *Bibb v. Navajo Freight Lines, Inc.,* 359 U.S. 520, 523–24, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959)).

be conducted at the vehicle seizure site unless conducting the search at the location is dangerous or impractical. The policy specifically directs officers to search a vehicle's trunk because it is an area "where personal property or hazardous material may reasonably be found."

Sathena West says a female police officer told her the police were searching the vehicle for drugs, stolen property, or weapons. *See* Sathena West affidavit at ¶¶ 8–9. Nothing in Sathena West's statement contradicts Garan's reasoning for the search. The police arrested Jackson on an outstanding arrest warrant and Sathena West's driver's license was suspended. Ciera West and Sathena West's two young sons could not drive the vehicle. The plaintiffs' vehicle was in fact towed. The plaintiffs do not challenge the validity of the police department's inventory search policy or the inventory of the vehicle's contents. Taking all of the evidence in the light most favorable to the plaintiffs, Garan's search of the vehicle was reasonable under the Fourth Amendment.

Therefore, the Court grants the defendant police officers' motion for summary judgment on the illegal search of the vehicle claim under § 1983.

### 3.

■ Third, Sathena West says the police conducted an unreasonable search of her person. She says the police did not have probable cause to conduct a search.

■ As discussed above, a search absent a warrant is per se unreasonable except for a few specific exceptions. *Katz,* 389 U.S. at 357, 88 S.Ct. 507. However, a consensual search is assumed to be reasonable. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Shutters,* 163 F.3d 331, 335 (6th Cir.1998). The scope of the consent given determines the permissi-

ble scope of the search. *United States v. Gant,* 112 F.3d 239, 242 (6th Cir.1997). The standard for measuring the scope of consent given is objective reasonableness- "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Id.* (quoting *Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991)).

■ In addition, an exception to the probable cause requirement exists when a police officer reasonably believes an individual threatens the safety of law enforcement officers or the public. *See, e.g., Warden, Md. Penitentiary v. Hayden,* 387 U.S. 294, 298–99, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). Under those circumstances, the officer may conduct a warrantless search of any place where he believes an inherently dangerous item is present. *See Cady v. Dombrowski,* 413 U.S. 433, 448, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973).

■ The reasonableness test also applies when a police officer places an individual in his patrol car for transport. *See Hullett v. Smiedendorf,* 52 F.Supp.2d 817, 822 (W.D.Mich.1999). For example, the Ninth Circuit held in an unpublished opinion that a police officer's search for weapons of an individual who was not under arrest but was being transported in the police car was constitutional if the officer "had a reasonable belief that [the individual] might be armed." *United States v. Saravia–Vidana,* No. 89–10501, 1991 WL 3293, at *3 (9th Cir. Jan.17, 1991). The court emphasized the officer "would not have been able to protect himself adequately if [the individual riding in the car] attacked the officer while he was engaged in driving the car and observing traffic." *Id.*

The Eighth Circuit has also held that police officers may constitutionally search an individual being transported in a police

car if the officers "had reasonable cause to believe that placing [the individual] in the back seat of the patrol car presented a potential danger to the officers." *United States v. Abokhai,* 829 F.2d 666, 670 (8th Cir.1987) (noting the potential danger of "the close proximity and limited observation of the [individual riding] in the back seat of the patrol car").

Garan says he offered Sathena West a ride to the police station. He says he obtained her consent to search her purse so that she could ride in the police car. Garan says nothing of searching Sathena West's person or searching any of the other plaintiffs.

Sathena West's description of events differs. She says a male and female officer searched her after she exited the vehicle. She also says the female officer searched her purse. Sathena West does not mention consenting to a search. However, in response to a question about whether weapons were in the car, Sathena West says "I said only knives used in relation to my job, for demonstration purposes." Sathena West affidavit at ¶ 10.

Once again, looking at the evidence in favor of the plaintiffs, the officers' search of Sathena West was reasonable. Sathena West clearly accepted a ride to the police station. Nothing in her affidavit contradicts Garan's statement that a search was done so that he would permit her into the police cruiser. Sathena West also told the police she had demonstration knives in her vehicle. An officer could reasonably view the presence of any knife as a safety threat. Therefore, the protective search before being placed in a police vehicle was reasonable.

Accordingly, the Court grants summary judgment to the defendant police officers' on the Sathena West's illegal search claim under § 1983.

4.

Fourth, Ciera and Tyerell West say the police violated their rights by locking them in the rear of a police cruiser. The plaintiffs say the police had no basis for holding them against their will.

Once the purposes of the initial traffic stop are completed, an officer may not continue to detain a vehicle or its driver without reasonable suspicion of criminal activity warranting further investigation. *United States v. Mesa,* 62 F.3d 159, 162 (6th Cir.1995). As discussed above, Garan had probable cause to make a traffic stop. Once he made the traffic stop, Garan determined none of the plaintiffs could validly operate the vehicle. Garan then conducted an inventory search before having the car towed. The plaintiffs exited the vehicle before the search.

Wadlington says he placed Sathena West's children and Ciera West in the back of his police cruiser where they would be "safe and warm." They were in the rear of the police car for approximately ten minutes before the police took them to the police station. Garan says the rear doors of the police cruisers automatically lock.

The only evidence the plaintiffs present to support their claim is Sathena West's statement that the police did not allow her to comfort her children when they became distressed. While this may be true, she does not present any argument as to why such an action rises to a constitutional claim. Furthermore, the plaintiffs present no other evidence to contrast the police officers' description of events.

No reasonable jury would find the plaintiffs' ten minute detention in the rear of a warm police cruiser during a valid inventory search unreasonable. *United States v. Sharpe,* 470 U.S. 675, 688, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (approving a 20 minute detention when the police officer

acted diligently and the suspect's own actions contributed to delay). The officers only detained the plaintiffs for the time necessary for them to complete the inventory search and transport them to the police station. *See, e.g., Gardner v. Village of Grand River, Ohio,* 955 F.Supp. 817, 826 (N.D.Ohio 1997). Therefore, the Court grants summary judgment to the defendant police officers on the plaintiffs' unreasonable seizure claim under § 1983.

5.

■ Finally, the plaintiffs allege that race discrimination led to their stop, search, and "detention." Specifically, they say Garan selectively stopped their vehicle because they were African–American.

■ The Equal Protection Clause of the Fourteenth Amendment prohibits purposeful discrimination in the enforcement of laws. Discrimination is purposeful "if it is intended to accomplish some 'forbidden aim.'" *Gardenhire v. Schubert,* 205 F.3d 303, 319 (6th Cir.2000) (quoting *Futernick v. Sumpter Township,* 78 F.3d 1051, 1056 (6th Cir.1996)). One such "forbidden aim" is the selective enforcement of laws because of race.

■ To establish a selective enforcement claim, a plaintiff must prove three elements:

First, [an official] must single out a person belonging to an identifiable group, such as those of a particular race or religion, or a group exercising constitutional rights, for prosecution even though he has decided not to prosecute persons not belonging to that group in similar situations. Second, [the official]

must initiate the prosecution with a discriminatory purpose. Finally, the prosecution must have a discriminatory effect on the group which the defendant belongs to.

*United States v. Anderson,* 923 F.2d 450, 453 (6th Cir.1991); *Gardenhire,* 205 F.3d at 319.

■ Here, the plaintiffs say Garan stopped their vehicle because they were African–American, not because the vehicle was missing a front license plate. The standard for establishing a selective enforcement claim is a "demanding one." *Stemler v. City of Florence,* 126 F.3d 856, 873 (6th Cir.1997). State actors benefit from a "strong presumption" that they have properly discharged their duties; only "clear evidence" to the contrary will overcome this presumption. *Id.*

The plaintiffs have not met this burden. In particular, they do not offer evidence satisfying the "absolute requirement" of any selective enforcement claim—a showing "that similarly situated persons outside her category were not prosecuted." *Id.* In fact, the plaintiffs do not offer much evidence at all that their race was the motivating factor behind their stop, search, and transportation to the police station. In the absence of such evidence, this is not one of the "rare" cases in which a selective enforcement claim survives summary judgment. *Id.*

■ Accordingly, the defendants are entitled to summary judgment on the plaintiffs' selective enforcement claim under § 1983.[6]

---

**6.** Since the Court finds the defendant police officers did not commit any constitutional violations, it need not address their qualified immunity with respect to the plaintiffs' claims brought under § 1983. However, were the Court to conduct such an analysis, the critical question would become whether any reason-

able officer in Garan, Wadlington, or Hagquist's position would know they allegedly violated the plaintiffs' constitutional rights. Drawing all inferences in favor of the non-moving party, the Court must look only to whether the plaintiffs have alleged " 'sufficient facts supported by sufficient evidence' "

## B.

■ Sathena West also sues the City of Aurora under § 1983. She alleges that the City of Aurora has an unofficial policy of harassing African–Americans.

■ The plaintiffs may not sue a municipality under § 1983 for an injury done solely by one of its employees. *Monell v. Department of Social Servs. of the City of New York*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Instead, only when the execution of a government's policy or custom causes an injury may a government be liable under § 1983. *Id.* The inadequacy of police training may only serve as a basis for municipal liability if the failure to train amounts to deliberate indifference to the rights of persons with whom the police came into contact. *Berry v. City of Detroit*, 25 F.3d 1342, 1345 (6th Cir.1994) (citing *City of Canton v. Harris*, 489 U.S. 378, 388–89, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). A municipality's deliberate indifference to the rights of persons with whom the police come into contact with transform its conduct into a "policy or custom" that is actionable under § 1983. *City of Canton*, 489 U.S. at 388–89, 109 S.Ct. 1197.

In support of their motion for summary judgment, Mayor Duncan and Police Chief Dietrich submitted affidavits saying the City of Aurora has no official or unofficial policy to harass African–Americans within the city limits. The plaintiffs do not offer any evidence suggesting the City of Aurora has an official policy of harassing or discriminating against African–Americans. Instead, the plaintiffs say the conduct of Garan, Wadlington, and Hagquist demonstrates the City of Aurora's discriminatory custom and policy.

As discussed above, Garan, Wadlington, and Hagquist's actions were constitutional. The plaintiffs may be genuinely upset with how the police treated them. However, the police officers' actions do not show a lack of training rising to a level of deliberate indifference on the part of the City of Aurora. In the absence of any evidence contradicting Duncan and Dietrich's affidavits, the Court grants summary judgment on their motion for summary judgment.

## C.

■ Beyond § 1983, the plaintiffs seek to recover against Garan, Wadlington, and Hagquist under various state tort causes of action. The defendant police officers seek summary judgment on each of these state claims. They say Ohio law provides them immunity from tort liability.

■ Ohio Revised Code § 2744.03(A)(6)(b) provides limited immunity to political subdivision employees. When engaged in governmental functions, such employees are immune from tort liability unless they act "with malicious purpose, in bad faith, or in a wanton or reckless manner...." § 2744.03(A)(6)(b).[7]

---

showing the defendant officers acted in an objectively unreasonable manner. *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996) (quoting *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir.1994)). The defendant officers' actions did not violate a clearly established constitutional right of which a reasonable person would have known.

7. "Malice" is the willful and intentional design to injure or harm another, usually seriously, through conduct that is unlawful or unjustified. *Cook v. City of Cincinnati*, 103 Ohio App.3d 80, 90, 658 N.E.2d 814, 821 (1995); *Piro v. Franklin Township*, 102 Ohio App.3d 130, 139, 656 N.E.2d 1035, 1041 (1995). "Bad faith" includes a dishonest purpose, conscious wrongdoing, or breach of a known duty through some ulterior motive. *Cook*, 103 Ohio App.3d at 90–91, 658 N.E.2d at 821; *Piro*, 102 Ohio App.3d at 139, 656 N.E.2d at 1041. "Wanton" misconduct refers to one's failure to exercise any care whatsoev-

As described in the Court's discussion of the § 1983 claims, the defendant police officers' conduct was reasonable. Garan had probable cause to stop the plaintiffs' vehicle and to conduct an inventory search. Similarly, Sathena West's search was a valid protective search before being placed into a police vehicle. Finally, Ciera and Tyerell West's brief "detention" in Wadlington's police cruiser was reasonable. Because these actions were objectively reasonable, they were not malicious, in bad faith, or done in a wanton or reckless manner. *See Boyer v. City of Mansfield,* 3 F.Supp.2d 843, 848 (N.D.Ohio 1998). Officers Garan, Wadlington, and Hagquist are entitled to immunity under Ohio Rev.Code § 2744.03. For this reason, the Court grants their motion for summary judgment on the plaintiffs' state law tort claims.

### IV. Conclusion

For the reasons discussed above, the Court grants the defendants motions for summary judgment. The plaintiffs' claims are dismissed.

IT IS SO ORDERED.

---

er. *Fabrey v. McDonald Village Police Dep't,* 70 Ohio St.3d 351, 356, 639 N.E.2d 31, 35 (1994); *Hawkins v. Ivy,* 50 Ohio St.2d 114, 363 N.E.2d 367 (1977) (syllabus). "Reckless" refers to conduct that causes an unreasonable risk of harm and is "substantially greater than that which is necessary to make his conduct negligent." *Thompson v. McNeill,* 53 Ohio St.3d 102, 104–05, 559 N.E.2d 705, 708 (1990) (quoting Restatement (Second) of Torts § 500 (1965)).